2011 Ark. App. 356

**Pamela Marshall CARROLL, Appellant**

v.

**Richard Dale CARROLL, Appellee.**

**No. CA 10–677.**

Court of Appeals of Arkansas.

May 11, 2011.

Crary Mac Noirton, Pine Bluff, for Appellant.

David O. Bowden, Little Rock, for Appellee.

RAYMOND R. ABRAMSON, Judge.

After twenty-five years of marriage, raising two children, and operating a family farm, Pamela and Dale Carroll began dividing their property in this divorce case. *Carroll v. Carroll*, CA07–1174, 2008 WL 4286494 (Ark.App. Sept. 17, 2008) (unpublished). They settled on some items and asked the circuit court to divide others. *Id.* One of the items in dispute was a membership in a hunting club purchased during the marriage. Richard Carroll stated that he purchased the membership with nonmarital funds, and Pamela Carroll disputed his claims.

The trial court made the following comments at the hearing on this issue: [1]

> Now we're going to discuss Mr. Carroll's claims for non-marital property. All right, let's talk about first of all this Jackson Point property, this hunting club interest. Now, according to Mr. Carroll he acquired this with non-marital funds, funds he had before the marriage, and there's also an exhibit here about—there was a $10,000.00 check in here that's marked, "Gift" from his mother, I believe, one of his exhibits. The parties were married, let's see, back in—I believe there was testimony about this. Let's see. According to the complaint, they were married on February 20, 1981. And here is this Defendant's Exhibit Number 3, regarding this Jackson Point Hunting Club, a limited partnership. This goes back to 1984. On the page it's typed, "September 5, 1984," and then apparently the signature page has got 8/21/84, and it's got the subscription amount as $35,000, signed by Richard Dale Carroll. Mrs. Pamela Carroll's name is not—she apparently didn't—it

---

1.  These comments and findings were incorpo-    rated into the supplemental decree.

says, "I agree to become a limited partner of Jackson Point Hunting Club." Apparently, according to this exhibit, Mrs. Pamela Carroll was not a party to this. Of course, this by itself doesn't mean it's non-marital property. You can acquire property and one spouse can acquire property in their name and their name alone, and it's still marital property. We have to look at the circumstances. Here's Exhibit 2 about this letter, August 22, 1984, from T.J. Raney and Sons, Inc. It speaks for itself. Here's this check, Defendant's Exhibit Number 4, this check from Mrs. Carroll to her son of 8/22/89. There was some testimony as I recall about this initial acquisition of this interest in this hunting club, and then later on, they reformed it or changed the entity some way or another. And, as I recall, Mr. Carroll got his money back, and then he had to—I'm not sure what the legal ramification of that was, but I understand that he paid the money back to the new entity or whatever it was, to this hunting club. The legal mechanics of all of that wasn't exactly clear, but that's what I understand from the testimony is basically what happened. Now, again, this was acquired early in the marriage, and the testimony was that Mr. Carroll, he was working for his father or, I guess, his father and mother. It's their family farming operation, and he was a farm laborer, and Mrs. Carroll here was working. She worked at Wal-Mart making minimum wage at the time early in the marriage. We have some exhibits here of what Mr. Carroll made. Well, here, this even goes back before the marriage. Defendant's Exhibit Number 1, this wage and tax statement from 1978 shows wages of $10,643.98. Here's one from 1982 showing—this is from William M. Carroll Farms, $16,594.08, and then here is 1983,

$18,197.09, from William M. Carroll Farms. And then here's from 1984 from William M. Carroll Farms, $19,875.32. According to the exhibits and testimony, $35,000.00 was paid for this interest in this hunting club. All this supports Mr. Carroll's contention that he had funds before the marriage, or non-marital funds, that he used to acquire this hunting club interest, and the evidence, the testimony preponderates in favor of Mr. Carroll in this regard, that he used non-marital funds to acquire it, just like Mrs. Carroll over here used non-marital funds to help the farming operation continue. So the court finds that the Carrolls' interest in the Jackson Point Hunting Club is non-marital property and belongs to Mr. Carroll and Mrs. Pamela Carroll has no interest therein.

Now, I do understand that there was a manufactured home placed on the hunting club property that was acquired during the marriage with marital funds. There was some testimony about that, and my ruling only applies to the interest in the hunting club. Now, if there was a trailer put out there, as I understand the testimony, to make a hunting camp or whatever it was, then that trailer would be marital property if that's what's out there. Any dispute with that? Am I correct? Is there a trailer out there?

COUNSEL FOR MR. CARROLL: Yes, sir, your Honor, there is a trailer out there, and the $10,000.00 that he got from the grandmother in '89 [sic], that's what went into the trailer. That's was [sic] where that check came from.

COUNSEL FOR MRS. CARROLL: Yeah, Judge, he took that same $10,000.00, and said he used it to purchase Jackson Point. He didn't get it until five years after Jackson Point. There was no proof in

the record of any money he paid to get Jackson Point. He gave us W2s. He gave us the reconstituted agreement. But there's absolutely no proof whatsoever presented to you of any money transaction. But you in your ruling said the $10,000.00 was available for Jackson Point. It wasn't available for Jackson Point.

THE COURT: Well, I'm going to find that his interest in the hunting club is nonmarital property and that the trailer home out there is marital property. That's my ruling. All we have is a check for $10,000.00 that's got marked "gift" on it, and that's what it says. But that's my view of the evidence.

After the court entered its supplemental decree on June 18, 2007, both parties filed Motions for Reconsideration, which were denied by the trial court. Pamela Carroll filed a timely notice of appeal, and Richard Carroll filed a timely notice of cross-appeal. However, because the trial court did not dispose of all the parties' property in the supplemental decree and because there were further noncollateral matters pending, this court dismissed the appeal for finality reasons. *Carroll v. Carroll*, CA07–1174, 2008 WL 4286494 (Ark.App. Sept. 17, 2008) (unpublished).

A final order was entered on March 18, 2010. Pamela Carroll once again filed a timely notice of appeal and has filed a brief in this matter. Richard Carroll also filed a brief and asserted several points on cross-appeal. The record, however, does not contain a notice of cross-appeal. Our case law is well settled that when an appellee seeks something more than he or she received in the lower court, a notice of cross-appeal is necessary to give us jurisdiction of the cross-appeal. *Boothe v. Boothe*, 341 Ark. 381, 17 S.W.3d 464 (2000); *Brown v. Minor*, 305 Ark. 556, 810 S.W.2d 334 (1991). Because Richard

Carroll failed to file a notice of cross-appeal, we are without jurisdiction to consider his arguments.

We next turn to Pamela Carroll's claims on direct appeal. Ms. Carroll appeals the trial court's order finding the Jackson Point Hunting Club membership (which was purchased two years after the parties were married) to be nonmarital property. Equity cases are reviewed *de novo*, and the trial court's findings of fact are affirmed unless they are clearly erroneous or clearly against the preponderance of the evidence. *Grover v. Grover*, 101 Ark.App. 346, 276 S.W.3d 740 (2008). A finding of fact is clearly erroneous when the reviewing court is left with a definite and firm conviction that a mistake has been committed; in reviewing the trial court's findings, this court gives due deference to the trial court's superior position to determine the credibility of the witnesses and the weight to be accorded to each witness's testimony. *Id.*

Here, the trial court's findings were clearly erroneous. The parties were married on February 20, 1981, and it is undisputed that the Jackson Point Hunting Club membership was purchased after the parties were married. All property acquired by either spouse subsequent to the marriage is considered marital property except for several specific statutory exceptions, including property acquired by gift or by reason of the death of another and property acquired in exchange for other nonmarital property. Ark.Code Ann. § 9–12–315 (Repl.2009). There is a presumption that all property acquired during a marriage is marital property. *McDermott v. McDermott*, 336 Ark. 557, 986 S.W.2d 843 (1999). As the hunting club membership was purchased after the marriage, it is presumptively marital property. Richard, as the party arguing that the membership interest was his separate

property, bears the burden of rebutting the presumption that the property was marital property. *Aldridge v. Aldridge,* 28 Ark.App. 175, 773 S.W.2d 103 (1989) ("The burden is on the party who asserts an interest in property to establish that it is in fact separate property not subject to division.").

■ The evidence in this case is simply insufficient to rebut that presumption. It is undisputed that the hunting club membership was acquired during the marriage for over $20,000 [2] and that marital funds were used to pay the annual fees. While Richard provided a single W2 from 1978, which showed an income of approximately $10,600, there was no evidence as to how much of this amount was used to purchase the membership interest, nor was there any other tangible evidence regarding where the funds used to purchase the membership originated. In fact, there were no bank records or other documentation indicating that the funds used came exclusively from Richard. The fact that the partnership document named Richard, not Pamela, as a limited partner in the hunting club does not prove that the membership was actually purchased with non-marital funds. Nor can the $10,000 check from Richard's mother dated August 22, 1989—well after the property was purchased—support a finding that the membership interest was purchased with non-marital funds. Rather, the only evidence presented to rebut the presumption was Richard's own self-serving testimony that he purchased the property with his own separate funds. Such evidence is simply not sufficient to satisfy the clear-and-convincing-evidence standard needed to over-come the presumption that the membership interest was marital property.

This court reached a similar conclusion in *Lofton v. Lofton,* 23 Ark.App. 203, 745 S.W.2d 635 (1988). In that case, the appellee, Floyd Lofton, and his brother each inherited a one-half interest in their father's house when their father died. Floyd later purchased his brother's one-half interest in the house using $5,000 in marital funds. Floyd then sold the house for $25,000. He took the proceeds from the sale of the house plus another $5,000 in marital funds to purchase two $15,000 certificate of deposits. The certificate of deposits were issued in the names of Floyd and Mary Lofton (his wife). The interest earned by the certificates of deposit was placed in their joint checking and savings accounts.

In the divorce proceedings, the trial court held that, because marital funds had been used to purchase the brother's one-half interest in the house, half the proceeds in the house constituted marital property and the other half constituted Floyd's separate property. Mary appealed the trial court's findings, arguing that Floyd, by placing the proceeds from the sale of the house into certificates of deposit bearing both names, had converted the property to a tenancy by the entirety, and therefore, the funds should have been divided equally.

On appeal, we held that, once property is placed in the names of persons who are husband and wife, without specifying the manner in which they take, there is a presumption that they own the property as tenants by the entirety and that it would take clear and convincing evidence to over-come that presumption.[3] We noted that

---

2. Mrs. Carroll testified that she believed the membership was purchased for approximately $20,000, while Mr. Carroll testified that he believed that the purchase price was $32,500.

3. In our case, the presumption arose by virtue of the fact that the property was purchased after the marriage. Thus, the fact that the membership interest was placed in Richard's

the only evidence that any of the funds evidenced by the certificates were intended to be Floyd's separate property were his statements that he did not concede that the certificates were marital property. We held that such testimony did not constitute clear and convincing evidence sufficient to overcome the presumption.

We acknowledge the dissent's assertion that the uncorroborated testimony of an interested party may in some instances be sufficient to satisfy the clear-and-convincing-evidence standard. Here, however, the trial court did not rely on Mr. Carroll's testimony alone, but rather erroneously relied upon the $10,000 check from Richard's mother and W2s from after the date of the marriage to support its finding that there were sufficient non-marital funds to acquire the hunting club interest. As a result, we are left with a definite and firm conviction that a mistake has been committed here. The trial court's order finding the ₈Jackson Point Hunting Club membership to be nonmarital property is hereby reversed and remanded.

HART, MARTIN, and HOOFMAN, JJ., agree.

PITTMAN and ROBBINS, JJ., dissent.

JOHN MAUZY PITTMAN, Judge, dissenting.

This is an appeal from an order dividing marital property. The only issue preserved for appeal concerns the status of the hunting club membership—was it marital or nonmarital property? The trial court found that it was nonmarital property. The majority holds that this finding was clearly erroneous. I cannot agree.

The trial court's finding that the property was nonmarital was based on appellee's testimony, which the trial court found to be credible:

> I used my personal money to purchase an interest in Jackson Point [Hunting Club]. It was money I'd saved before I got married. I paid thirty-two thousand, five hundred. I had to redo Jackson Point in '84. Defendant's Exhibit 2 is showing where I paid for it in '84. None of [appellant's] money went into buying Jackson Point.

Because the property was acquired during the marriage, appellee was required to rebut the presumption that the property was marital with clear and convincing evidence. The testimony quoted above, if believed, is clearly sufficient to rebut this presumption.

> Clear and convincing evidence is evidence by a credible witness whose memory of the facts about which he testifies is distinct, whose narration of the details is exact and in due order, and whose testimony is so direct, weighty, and convincing as to enable the factfinder to come to a clear conviction, without hesitance, of the truth of the facts related. It is simply that degree of proof that ₉will produce in the trier of fact a firm conviction of the allegations sought to be established. Our test on review is not whether we are convinced that there was clear and convincing evidence to support the trial judge's finding, but whether we can say that the finding is clearly erroneous.

*First National Bank v. Rush,* 30 Ark.App. 272, 279, 785 S.W.2d 474, 479 (1990). The Rush court held that the trial court did not err in accepting uncorroborated testimony of interested parties as clear and convincing evidence because the testimony satisfied this standard.

name only is not necessarily controlling in this case.

I disagree with the majority's conclusion that there is no relevance to evidence, in the form of appellee's W2 forms, to show that he made sufficient money before his marriage to pay for the club membership that was bought shortly thereafter. To my mind, this evidence—and the evidence that the club membership was taken in appellee's name alone—appear to corroborate appellee's testimony that he purchased the club membership solely with nonmarital funds earned before the marriage. But this is a trifle. My overriding concern is that the majority has given no deference to the trial judge's superior opportunity to assess the witness's credibility. The appellee's testimony was not inherently improbable; to the contrary, it was distinct, detailed, and direct. If believed, it would unquestionably support the trial judge's finding. The essential question, then, was whether appellee testified in a forthright and believable manner. We did not witness this testimony, but the trial judge did and thus had the advantage of body language, eye contact, tone of voice, and the plethora of nonverbal indicia of credibility that are not recorded in the transcript of the proceeding. I think that, if we are to hold under such circumstances that a trial judge's credibility determination was clearly wrong, we should be able to clearly explain our reasoning.

I respectfully dissent.

ROBBINS, J., joins in this dissent.