SLIP OPINION



Cite as 2013 Ark. App. 733

# ARKANSAS COURT OF APPEALS

DIVISION IV
No. CV–13–609

| | |
|---|---|
| ROBERT BIRD COLQUITT<br>APPELLANT | **Opinion Delivered** December 11, 2013 |
| V. | APPEAL FROM THE COLUMBIA COUNTY CIRCUIT COURT [NO. DR–NO. 2011-197-1] |
| LINDA COLQUITT<br>APPELLEE | HONORABLE HAMILTON H. SINGLETON, JUDGE |
| | AFFIRMED |

## RITA W. GRUBER, Judge

Robert Colquitt and Linda Colquitt married in 1989. They separated in 2011, and Mr. Colquitt filed a complaint for divorce in the Circuit Court of Columbia County. Ms. Colquitt answered and counterclaimed for divorce, requesting both an unequal division of property and spousal support. Mr. Colquitt withdrew his complaint and waived corroboration of grounds at the final hearing on September 12, 2012, and Ms. Colquitt was granted an absolute divorce. After hearing the parties' testimony and receiving exhibits into evidence, the court took the matter of property division under advisement and ordered posttrial briefs. The court commented that the parties could "still make this work a whole lot better yourselves than I'm going to be able to do," and urged them to "try to [settle] this yourselves while I've got this under advisement." No settlement was reached.

The circuit court subsequently issued a letter opinion and a decree of divorce, entered on April 17, 2013. Mr. Colquitt now appeals, challenging the unequal division of four houses

SLIP OPINION

in Magnolia, Arkansas, which the parties owned as tenants by the entirety. He contends that the court's decision to make an unequal division was clearly erroneous and, as to the marital home itself, was an error of law. We affirm.

A circuit court may order an unequal distribution of marital property if the court finds an equal division to be inequitable; in such cases, the court shall recite its basis and reasons for not dividing the marital property equally. Ark. Code Ann. § 9-12-315(a). Our statute specifies the following:

(1)(A) All marital property shall be distributed one-half (1/2) to each party unless the court finds such a division to be inequitable. In that event the court shall make some other division that the court deems equitable taking into consideration:

(i) The length of the marriage;

(ii) Age, health, and station in life of the parties;

(iii) Occupation of the parties;

(iv) Amount and sources of income;

(v) Vocational skills;

(vi) Employability;

(vii) Estate, liabilities, and needs of each party and opportunity of each for further acquisition of capital assets and income;

(viii) Contribution of each party in acquisition, preservation, or appreciation of marital property, including services as a homemaker; and

(ix) The federal income tax consequences of the court's division of property.

(B) When property is divided pursuant to the foregoing considerations the court must state its basis and reasons for not dividing the marital property equally between the parties, and the basis and reasons should be recited in the order entered in the matter;

(2) All other property shall be returned to the party who owned it prior to the marriage unless the court shall make some other division that the court deems equitable taking into consideration those factors enumerated in subdivision (a)(1) of this section, in which event the court must state in writing its basis and reasons for not returning the property to the party who owned it at the time of the marriage.

Ark. Code Ann. § 9-12-315(a) (Repl. 2009).

In its letter opinion, the court noted that it had not received a stipulation of the rental property's value despite a docket entry reflecting that counsel were to do so while the court had the case under advisement. The court also expressed its disappointment that neither party had done "a very good job" of establishing values for the personal property that each desired. From its review of the evidence and posttrial briefs, the court found that the case called for an unequal division of the marital estate and that the equities favored awarding Ms. Colquitt a larger share.

The court's decree of divorce ordered the unequal division of the marital property after discussing the factors that the court had considered. Mr. Colquitt was awarded his three individual IRAs, Ms. Colquitt was awarded her individual IRA, and the parties were to divide equally an IRA held in their joint names.[1] Mr. Colquitt received all tools and diagnostic equipment necessary for his automobile-repair work, and the parties individually received various other items of personal property located within the marital residence. Ms. Colquitt was awarded the parties' marital home at 623 West Monroe, where she had continued to live

---

[1]Mr. Colquitt testified that the parties had "about $60,000 in IRA's together" and that Ms. Colquitt had separate property of $18,000. Ms. Colquitt testified that her IRA was worth about $19,000 and that her halves of two Edward Jones accounts would be about $10,000 and $20,000.

after their separation, as well as their properties at 615 West Monroe and 318 South Kelso, which were two of three rental houses. Mr. Colquitt was awarded the property at 405 South Walnut, the parties' third rental home. Each party was to be responsible for any debt related to property awarded by the decree. In light of the unequal division of property, the court denied Ms. Colquitt's request for spousal support.

*Point on appeal: Whether the unequal division was clearly erroneous and, as to the marital home, was an error of law.*

Mr. Colquitt first argues that the circuit court's unequal division of real estate, which was held as tenants by the entirety, was clearly erroneous because it was "inappropriate on the evidence presented, especially because the court acknowledged it had no values to rely upon." Second, he argues that "as to one tract, the marital home, an unequal division was an error of law" because it was purchased before 1997, when a statutory amendment first authorized unequal division of property owned as tenants by the entirety. *See Cole v. Cole*, 53 Ark. App. 140, 920 S.W.2d 32 (1996) (holding that the trial court could not rely on Ark. Code Ann. § 9-12-317(c) in awarding wife the entire interest in the marital residence because the statute was not passed until 1997, after the parties had acquired the property, and that doing so would impair a vested interest).

We do not address the second argument presented to us. An issue must be presented to the trial court at the earliest opportunity in order to preserve it for appeal. *Taylor v. Taylor*, 369 Ark. 31, 250 S.W.3d 232 (2007). Where nothing appears in the record reflecting that a particular argument was formulated before the trial court, or that any ruling was given, the appellant has waived review of that issue. *Id.* Furthermore, an appellant cannot complain on

4

SLIP OPINION

appeal that the trial court erred if the appellant induced, consented to, or acquiesced in the court's position. *Keathley v. Keathley*, 76 Ark. App. 150, 61 S.W.3d 219 (2001). Here, Mr. Colquitt did not develop his argument regarding section 9-12-317 below, nor did the trial court rule upon it; as such, it is waived and cannot be addressed on appeal.

The parties testified at length about their real properties. Mr. Colquitt testified that the marital home at 623 West Monroe Street had sentimental value to him because he grew up there with his siblings. He acknowledged that the home had been appraised for $92,000 and had debt of about $3,500; however, he alternatively testified that he did "not know" its worth and that it was worth approximately $90,000. Regarding the rental houses, he testified that 405 South Walnut Street had an estimated value of about $38,000, on which about $12,000 was owed; 318 South Kelso had an approximate value of $33,000, with $15,000 or $16,000 being owed; and 615 West Monroe was valued at about $42,000, with $30,000 owed. He stated that the value of the tools he wished to retain for his automobile-repair business was "probably pretty similar" to the value of the marital home's furniture and furnishings Ms. Colquitt wanted. He said that he could "buy COBRA for $538 a month" and would work until at least age sixty-five because he had no health insurance. He further testified:

> If I kept my tools and was able to work and she kept all the furniture, then I would sell all the real property and divide the money. I see Ms. Colquitt's figures here, if they are correct, there's about $150,000 equity in the four pieces of real property. So she would get $75,000.00. She has her separate property of $18,000 and we have about $60,000 in IRAs together. That's about $30,000. She would have about $125,000 cash. I would have about $125,000 cash. She would have all the furniture and I would have all the tools.

5

Ms. Colquitt testified that although her interrogatory answers valued 623 West Monroe at the appraised value of $92,000, "with the . . . the neighborhood that we're in it would not bring $90,000." She related that the South Walnut property was appraised at $38,000, the Kelso property was appraised at $33,000, and 615 West Monroe was "worth $42,000." She acknowledged that her statement of financial means showed debt of $55,072 on the four properties' total value of $205,000, leaving equity of about $150,000 to be divided equally, but she testified that she did not think a sale would bring "anything close" to their appraised value.

Ms. Colquitt testified that she had last worked as an LPN in 2009, when she retired from a clinic; that she currently was in her third year of employment at the Magnolia Housing Authority; that she planned to work two years more until age seventy; and that there was not much job market in Magnolia for her as a nurse unless she wanted nursing-home work. She said that her two small retirement checks and her social security combined for about $1,250 monthly. She testified that rental income was $500 for 615 West Monroe, $400 for Kelso, and $450 for South Walnut, totaling $1,350. She said that she did "not collect enough money in the rental account to almost exactly service the notes," on which payments were $1,486; that nothing was left in the rental account after taxes and insurance; and that in the past year, the parties had paid significant upkeep on the houses. She asked the court to award the rental properties to her:

> I know they're upkeep but I've managed this past year. I would like to have them so that would be a retirement for me once they're paid for. Other than what we just talked about in terms of retirement, that is the only additional income that I could receive. Assuming that I can keep renters in those houses I will have those rent houses



paid off at some point in the future. I'm fairly close to paying off the marital home. I've made all those payments on the marital home in the last year.

. . . .

The potential future income on these rental houses [is] more important to me at this age and station in my life than any proceeds I might realize from the sale. The future rental income is more important to me than the potential sale value of these properties at this time.

Ms. Colquitt noted that she would "have to pay a lot of taxes" should the properties be sold and were she to receive a lump sum of cash. In her posttrial brief, she stated that tax implications could be significant because both parties would have capital gains, further reducing the estate and diminishing her share.

On appeal, Mr. Colquitt asserts that the circuit court's primary basis for an unequal property division was a perceived discrepancy in the parties' present and future incomes. He complains that Ms. Colquitt now will have additional monthly income of $390 in rental income from the Kelso and West Monroe properties—the difference between what they bring in and the amount of the mortgage payments. He refers to evidence valuing the various properties as "questionable," and he asserts that the court acknowledged having no information on their value.

The court's decree of divorce included ten findings of fact considered by the court in rendering the unequal division of property under Arkansas Code Annotated section 9-12-315(1). First, the parties were married for twenty-three years; both contributed financially to the acquisition of the marital estate and the payment of monthly bills; both contributed financially and personally to the car-repair business established by Mr. Colquitt; and Ms. Colquitt contributed her talents as homemaker. Second, Ms. Colquitt was sixty-eight years

7

old at the time of the hearing and Mr. Colquitt was fifty-nine.

Third, Ms. Colquitt had retired from the profession of nursing but continued to work for the housing authority, and her monthly income was $888.54 from her job, $1,052.90 from social security, APERS retirement of $133.15, and Aetna retirement of $77.14—totaling $2,151.73. Fourth, Ms. Colquitt planned to retire at age seventy, which was less than two years away and would reduce her income to $1,263.19. Fifth, Mr. Colquitt's weekly income of $613.14, or $2,637.68 monthly, was $485.95 more than Ms. Colquitt's monthly income. Sixth, there was presently a "significant difference in annual income" of $5,831.40, and upon Ms. Colquitt's retirement in two years, there would be "a most significant difference in annual income" of $16,493.88.

Seventh, the difference in annual income did not take into consideration social-security benefits that Mr. Colquitt would be entitled to receive at age sixty-five or sixty-six "nor . . . the possibility of his earning even more in his chosen field of work." Eighth, Mr. Colquitt testified that "he inherited some amounts from his mother's estate" over the past five or more years and would continue to receive $1,000 to $10,000 a year for oil-and-gas leases and timber leases; Ms. Colquitt, on the other hand, had no prospect of any inheritance. Ninth, Mr. Colquitt asked to have two boats and a trailer, a 1990 Dodge pickup, a 1990 Ford S10 [sic] pickup, a 1996 Geo, a 1994 GMC, and a 1972 pickup—with an assessed value on the parties' 2012 personal-property tax assessment of $2,160 and at least a minimum value of $10,800. Tenth, Ms. Colquitt "traded in her older model Suburban for a newer more dependable vehicle, and she shall be responsible for the debt thereon."

SLIP OPINION

We review division–of–marital–property cases de novo, but the trial court's findings of fact are affirmed unless they are clearly erroneous or against the preponderance of the evidence. *Grantham v. Lucas*, 2011 Ark. App. 491, 385 S.W.3d 337. A finding of fact is clearly erroneous when the reviewing court is left with a definite and firm conviction that a mistake has been committed; in reviewing the trial court's findings, the reviewing court gives due deference to the trial court's superior position to determine the credibility of the witnesses and the weight to be accorded to each witness's testimony. *Carroll v. Carroll*, 2011 Ark. App. 356, 384 S.W.3d 50. The burden is upon the appellant to bring up a record sufficient to demonstrate that the circuit court was in error. *McCormick v. McCormick*, 2012 Ark. App. 318, --- S.W.3d ----.

Here, there was evidence and argument before the court on all factors to be considered in an unequal division of marital property under Arkansas Code Annotated section 9-12-315, and the court discussed most of those factors in its decree of divorce. The parties agreed that their houses would not sell for the appraiser's valuation that Ms. Colquitt presented. The unequal division of real property gave Ms. Colquitt, who was within two years of retirement, a house in which to reside and a means of generating current and future income from rental property. From our de novo review of the record, we cannot say that the circuit court clearly erred in the ten findings that support awarding Ms. Colquitt three of the four houses.

Affirmed.
GLADWIN, C.J., and WALMSLEY, J., agree.
*Ronald L. Griggs*, for appellant.
*Bell & Boyd, P.A.*, by: *Michael W. Boyd* and *Karen Talbot Gean*, for appellee.

SLIP OPINION