Cite as 2020 Ark. App. 389

# ARKANSAS COURT OF APPEALS
DIVISION I
**No.** CV-19-441

| | |
|---|---|
| JOHN ANTHONY MIDDLETON | **Opinion Delivered:** September 9, 2020 |
| APPELLANT | APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT, SIXTEENTH DIVISION [NO. 60DR-17-3534] |
| V. | |
| CATHY J. MIDDLETON | HONORABLE MORGAN E. WELCH, JUDGE |
| APPELLEE | AFFIRMED |

## MEREDITH B. SWITZER, Judge

John and Cathy Middleton were married on September 9, 1995, separated on September 29, 2017, and divorced on January 24, 2019. John brings this appeal, challenging the order entered by the circuit court in the divorce proceeding in two regards. First, John contends the circuit court erred in its unequal distribution of property and allocation of marital debt. Specifically under this point, he makes the following arguments: (a) the allocation of the entire IRS debt to John was clearly erroneous; (b) the distribution of property was inequitable; and (c) characterizing the shop as marital property was error. Second, John contends the circuit court erred by awarding alimony to Cathy. We affirm.

In the divorce decree, the circuit court found that there was a marital debt of at least $382,029.60 owed to the Internal Revenue Service (IRS) and that John was solely responsible for paying the IRS debt plus all associated interest and penalties. The court reasoned that it would be inequitable to hold Cathy responsible for any portion of the debt

because of the disparity in the parties' earning capacity and because the debt existed as a result of John's "egregious mismanagement of marital funds" and wasting marital funds by "excessive gambling."

The court further found that there were three parcels of marital real property (encumbered by the federal tax liens): (1) a mobile home located on approximately three acres and valued at $68,405.00; (2) 2.79 acres valued at $20,775; and (3) a lot adjacent to the marital home with a "shop" located thereon, which was valued at $55,000. The court concluded it would be inequitable to order the properties sold or award any of them to Cathy because of the tax liens. Consequently, the court awarded the parties' real property to John and ordered him to pay Cathy $72,090 as her half of the value of the properties.

With respect to the marital business, Mid-South Boring, LLC, the court found that the business was created in 1999 and that Cathy assisted John in running the business, undertaking a range of tasks from bookkeeping to field work. The court found the value of the business to be $268,250, considering the equipment value, accounts receivable, checking account balance, and accounts payable. The court specifically noted that it accorded significant weight to Cheryl Shuffield's expert testimony and adopted her work as the findings of the court. Ms. Shuffield was retained as an expert to assist with analysis of financial records and other matters in the case. Cathy was awarded $134,125 as her one-half interest in the business, and the court gave John the option of paying that amount in full within thirty days of the decree's entry or paying at the rate of $2,000 per month until the amount was paid in full.

2

Beyond the aforementioned divisions, for the most part, the parties were awarded all marital personal property in his or her possession. The parties owned four vehicles, two of which were awarded to John (along with responsibility for all debts, expenses, and insurance related thereto), one of which was awarded to Cathy, and the fourth was given to their adult daughter. Each party retained all funds in any checking or similar account held in his or her sole name. The court awarded Cathy $2,500 in marital funds that were being held in her attorneys' trust account because they were intended to be used for repairs to the marital home, but the repairs were never made. Aside from the IRS tax debt, the parties agreed to the division of remaining marital debt and each party was solely responsible for any and all other debts in his or her sole name.

In addition, the court found that both permanent and rehabilitative alimony were appropriate for Cathy, awarding her $3,500 per month for two years and $2,000 per month thereafter until her death or remarriage. Additional findings, rulings, and rationales for the circuit court's decisions will be discussed in addressing John's arguments on appeal.

We review divorce cases de novo on appeal. *Hayden v. Hayden*, 2020 Ark. App. 152, 594 S.W.3d 912. The circuit court's findings of fact regarding property division will be affirmed unless they are clearly erroneous or clearly against the preponderance of the evidence. *Id.* A finding is clearly erroneous when the reviewing court, on the entire evidence, is left with a definite and firm conviction that a mistake has been made. *Moore v. Moore*, 2019 Ark. 216, 576 S.W.3d 15. We also give due deference to the circuit court's determination of the credibility of the witnesses and the weight to be given to their testimony. *Id.*

3

I. *The Distribution of Property and Allocation of Marital Debts*

In his first point of appeal, divided into three subpoints, John contends that the circuit court clearly erred in its distribution of marital property and allocation of marital debts. We disagree.

All marital property shall be distributed one-half to each party unless the court finds such a division to be inequitable. *Moore, supra* (citing Ark. Code Ann. § 9-12-315(a) (Repl. 2015)). If the circuit court finds such a division would be inequitable, then it shall make some other division that the court deems equitable, taking into consideration a list of nine factors set forth in Arkansas Code Annotated section 9-12-315. *Hayden, supra*; Ark. Code Ann. § 9-12-315. The nine factors are the (1) length of the marriage; (2) age, health, and station in life of the parties; (3) occupation of the parties; (4) amount and sources of income; (5) vocational skills; (6) employability; (7) estate, liabilities, and needs of each party and opportunity of each for further acquisition of capital assets and income; (8) contribution of each party in acquisition, preservation, or appreciation of marital property, including services as a homemaker; and (9) federal income tax consequences of the court's division of property. *Id*. The court must state its basis and reasons for not dividing the marital property equally between the parties, and the basis and reasons should be recited in the order. *Id*. When a circuit court does not recite any of the statutory reasons why an unequal distribution is equitable, reversal is required. *Id*. However, the circuit court is not required to list each factor in its order or to weigh each factor equally. *Moore, supra*. Moreover, the specific enumeration of the statutory factors does not preclude the circuit court from considering other relevant factors, where exclusion of other factors would lead to absurd results or deny

4

the intent of the legislature to allow for the equitable division of property. *Id.* Exceptions to the rule of equal distribution will always depend on the specific facts as reflected by the circuit court's findings and conclusions. *Doss v. Doss*, 2018 Ark. App. 487, 561 S.W.3d 348. The statute requires the lower court simply to explain its reasons for not dividing the marital property equally, not to recite each of the statutory factors in the order. *Id.*

The allocation of marital debt must be considered in the context of the distribution of all the parties' property. *Hayden, supra.* Arkansas Code Annotated section 9-12-315 does not apply to the division of marital debt, and there is no presumption that an equal division of debts must occur. *Goodson v. Bennett*, 2018 Ark. App. 444, 562 S.W.3d 847. A determination that debts should be allocated between the parties on the basis of the relative ability to pay is not a decision that is considered clearly erroneous. *Doss, supra.*

## A. The IRS Debt

For his first argument under Point I, John contends the circuit court clearly erred in allocating the entire IRS debt to him. We disagree.

The circuit court found that the federal tax debt incurred during the marriage was at least $382,029.60 and specifically found that it was a marital debt. John does not challenge the accuracy of the amount of this debt. Instead, he argues that the circuit court's ruling was inequitable and clearly erroneous because Cathy enjoyed the benefits of the business income that gave rise to the tax liability but didn't want to be responsible for the taxes. Our de novo review does not leave us with a definite and firm conviction that the circuit court made a mistake in requiring John to be solely responsible for this tax debt. The circuit court considered this marital debt in the context of the distribution of the parties' property. The

5

court explained that John's failure to pay taxes had been a point of contention in the marriage and, after consulting with a CPA, Cathy filed separate returns and paid her own taxes. The court also specifically found that it would be inequitable to hold Cathy responsible for any portion of the tax debt because there was such great disparity in the parties' earning capacity, and the federal tax debt was due to John's mismanagement of marital funds. John himself testified that he made enough money to pay off all the tax liens and still have in excess of $300,000 to $400,000; instead, John wasted that money through his excessive gambling. We hold that the circuit court did not clearly err.

### B. The Real Property, Business, and Dissipated Marital Funds

Under this subpoint, John contends the circuit court's division of the parties' real property, business, and dissipated marital funds was so inequitable as to require reversal. We disagree.

In particular, John challenges three awards made by the circuit court: (1) The circuit court awarded the real property to John but ordered that he pay Cathy one-half the value of the real property in a lump sum, which was determined to be $72,090; (2) the circuit court awarded John the business, Mid–South Boring, LLC, but ordering him to pay Cathy her one-half interest in the business in the amount of $134,125, either in a lump sum or at the rate of $2,000 per month until paid in full; and (3) the circuit court ordered John to reimburse Cathy for one-half of the marital funds the court found John had dissipated ($179,388.17). The total dollar amount awarded to Cathy was $385,603.17, $134,125 of which could be paid in monthly installments of $2,000 until paid in full. John received the marital real property and the business.

6

The gist of John's argument under this point is that he will be reduced to poverty if the circuit court's awards remain in place. He argues that the real property is essentially worthless because of the tax liens and that the business has no prospective jobs for the foreseeable future and could not be expected to earn the same amount of revenue that it had in the past. He further argues that even if he were able to sell the real property and liquidate the business, he would not have enough money to pay the IRS debt much less the amounts the court ordered him to pay.

The circuit court explained that it would be inequitable to order any of these properties sold because neither party would receive any value from the sale as a result of the IRS liens attached to the property. The court further explained that it would also be inequitable to award any of these properties to Cathy because they remained encumbered by John's debts.

As with the first subpoint, the circuit court's division of the real property and reimbursement of dissipated funds to Cathy hinged, in part, on its conclusion that Mid–South Boring could be expected to earn the same amount of revenue that it had in the past. Although the following findings were noted in the decree as part of the alimony award, it is fair to take note of them with respect to the court's other property decisions when considering John's income. Specifically, the circuit court found that it did not consider financial information provided by John to be credible and that John's CPA's opinion was only as reliable as the information John provided to him. The circuit court found that Cheryl Shuffield was the only professional who had conducted an independent review of John's income. Based on Ms. Shuffield's calculations, the court found that John earned a

pretax income of more than $30,000 per month. After subtracting monthly expenses of $6,542, as shown in John's affidavit of financial means, the court further found that he would still have over $24,000 per month available to pay spousal support and current income taxes. The court noted that John was forty-seven years old and had no health issues that would impact his ability to earn income, while Cathy was fifty-three years old and had a high-school education, minimal work experience, and health problems that limited her ability to perform physically demanding tasks. We hold there was no clear error in the circuit court's award regarding the marital real property, the business, and the dissipated marital funds.

## C. The Characterization of the "Shop Property"

For his final subpoint, John contends that the circuit court clearly erred in characterizing the "shop property" as marital property. He alleges that even though he did not receive the deed until after the marriage, he paid for the property in full prior to the marriage. Alternatively, he claims that even if he did not pay for the property in full prior to the marriage, he paid a "large amount," and at a minimum, the court should have determined that this property was at least partially nonmarital. We are not persuaded that John met his burden of proving the portion of the property he claimed was nonmarital and therefore find no clear error on this point.

John executed a purchase agreement with respect to the property at 11110 Muscadine Lane on September 5, 1990. Pursuant to the purchase agreement, the purchase price for the property was $13,500, to be paid in monthly installments until paid in full. John was also responsible for paying taxes, assessments, and insurance and to provide the seller with proof of such payment. Upon payment of the entire debt, the seller would

8

convey to John the described property by warranty deed. In the case of default, the seller had the option to rescind the agreement. In the event of rescission, all moneys paid would be retained by the seller, not as a penalty, but as rent for the property, and the relation of the parties thereafter was to be that of landlord and tenant.

John and Cathy married in 1995. John testified that he completed payment for the property before the marriage, but he acknowledged that he did not acquire the deed to the property until after the marriage. As with other financial information provided by John, the circuit court did not find John's testimony regarding payment for the property to be credible. Other than his own testimony, John presented no evidence to establish the value of the portion of the property that he alleges is nonmarital. As the circuit court noted in the decree, "[b]ecause [John] failed to present clear and convincing evidence quantifying any alleged nonmarital portion of the property, the Court is unable to find the property partially non-marital."

Even on appeal, John argues that even if he did not pay for the property in full, he paid for a "large amount," yet he still has not established that amount. Cathy, on the other hand, presented evidence showing that marital funds were used not only to finish paying for the property but also to make significant improvements to the property, including the addition of the "shop" to the property. Moreover, the court found that John failed to provide any evidence of the value of this property, so the court adopted Cathy's valuation of $55,000. Under these circumstances, we are not left with a definite and firm conviction that the circuit court made a mistake in characterizing the "shop property" as marital.

9

In short, our de novo review of the circuit court's allocation of the IRS debt to John and its division and award of the real property, the business, and the repayment of dissipated marital funds convinces us that the circuit court did not clearly err.

## II. *Alimony*

For his final point of appeal, John argues that the circuit court erred by awarding alimony to Cathy. We do not agree.

Generally, the purpose of alimony is to rectify economic imbalances in earning power and standard of living in light of the particular facts in each case. *Goodson v. Bennett*, 2018 Ark. App. 444, 562 S.W.3d 847. The primary factors to be considered in determining whether to award alimony are the financial need of one spouse and the other spouse's ability to pay. *Id.* Secondary factors for consideration include the following: the financial circumstances of both parties; the couple's past standard of living; the value of jointly owned property; the amount and nature of the parties' income, both current and anticipated; the extent and nature of the resources and assets of each of the parties; the amount of income of each that is spendable; the earning ability and capacity of each party; the property awarded or given to one of the parties, either by the court or the other party; the disposition made of the homestead or jointly owned property; the condition of health and medical needs of both husband and wife; the duration of the marriage; and the amount of child support should also be considered. *Foster v. Foster*, 2016 Ark. 456, 506 S.W.3d 808. Arkansas Code Annotated section 9-12-312(a) authorizes permanent alimony, and section 9-12-312(b) authorizes rehabilitative alimony. The same factors may be considered in deciding whether to award either type of alimony. *Foster, supra.*

10

An award of alimony is within the circuit court's sound discretion, and this court will not reverse the circuit court's decision to award alimony absent an abuse of that discretion. *Foster*, *supra*. The circuit court may make an award of alimony that is reasonable under the circumstances, and the amount of alimony should not be reduced to a mathematical formula because the need for flexibility outweighs the need for relative certainty. *Id*. Moreover, the circuit court is in the best position to view the needs of the parties in connection with an award of alimony. *Id*.

Here, the circuit court found that both permanent and rehabilitative alimony were appropriate for Cathy, awarding her $3,500 per month for two years and $2,000 per month thereafter until her death or remarriage. In making these awards, the court considered various factors: the parties had been married twenty-three years; John had generated nearly all the marital income; Cathy had been a stay-at-home mother and assisted John with the business, without pay; Cathy later worked part time in a retail store and at the time of the divorce was earning minimal income caring for her disabled father; Cathy was fifty-three years old, had a high-school education, health issues, and minimal work experience—making it unlikely she would be able to establish a career path to afford the standard of living she had enjoyed during the marriage; Cathy's current income and anticipated earning capacity were not sufficient to cover her basic monthly living expenses of $6,345; and she had not yet reached retirement age and had some bookkeeping and other experience that could be expanded, given time.

The court also noted that John had a demonstrated ability to pay alimony. As part of the divorce, John had been awarded the well-established marital business and would

11

presumably continue to earn substantial income from it. The court reasoned that John therefore had a high earning capacity and income in excess of his monthly living expenses. The court also considered that John was only forty-seven years old and did not have any health issues that impacted his ability to earn income. The court found that John's exhibits regarding his income were not credible and his affidavit of financial means was unreliable. As previously noted, the court found that Cheryl Shuffield was the only professional who had conducted an independent review of John's income, and using her calculations, the court found that John earned a pretax income of more than $30,000 per month, his affidavit of financial means showed living expenses of $6,542 per month, and that after subtracting his monthly expenses, John would still have over $24,000 per month available to pay spousal support and current income taxes. John's ability to pay alimony was also demonstrated by the fact that he spent an average of $22,903 per month on gambling and supported his live-in girlfriend, who did not work. In reaching its decision, the circuit court also noted that Cathy had been awarded a sum well in excess of $350,000, and while her income would never be commensurate with John's, she had some ability to earn some amount of income.

The circuit court considered the primary and secondary factors for determining whether to award alimony and explained its rationale for awarding both permanent and rehabilitative alimony and the appropriateness of the amounts awarded with respect to each. We hold the court did not abuse its discretion in making these awards.

Affirmed.

ABRAMSON and VIRDEN, JJ., agree.

12

*Davidson Law Firm*, by: *Joshua M. Allen* and *Charles Darwin "Skip" Davidson*, for appellant.

*Dover Dixon Horne PLLC*, by: *Gary Rogers* and *Adrienne M. Griffis*, for appellee.