Cite as 2024 Ark. App. 453

# ARKANSAS COURT OF APPEALS
## DIVISION IV
No. CV-22-714

|  |  |
|---|---|
| MARY CORINNE SMART-MOORE<br><div align="right">APPELLANT</div><br>V.<br><br>JAMES MOORE<br><div align="right">APPELLEE</div> | Opinion Delivered September 25, 2024<br><br>APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT, FOURTEENTH DIVISION<br>[NO. 60DR-21-2333]<br><br>HONORABLE SHAWN J. JOHNSON, JUDGE<br><br>AFFIRMED IN PART; REVERSED AND REMANDED IN PART; AND REMANDED FOR CORRECTION OF CLERICAL ERRORS |

**CINDY GRACE THYER, Judge**

Mary Corinne Smart-Moore and James Moore were divorced on June 27, 2022, after a four-and-a-half-year marriage. Mary appeals from the divorce decree, arguing that the Pulaski County Circuit Court abused its discretion in its calculation of child support and erred in its characterization of certain funds as marital property. We affirm the child-support award but remand for correction of the decree's clerical errors. However, we reverse and remand on the court's division of property.

Mary and James were married on December 31, 2017. They have one child, MC, who was born in 2018. On July 22, 2021, Mary filed a complaint for separate maintenance

requesting full custody of MC1, spousal and child support, an award of real and personal property, and a temporary division of debts.

James counterclaimed for divorce. He alleged general indignities as his ground for divorce and requested custody of MC subject to Mary's visitation. He also asked for child support and to have the marital debt and property adjudicated.

A temporary agreed order was entered on September 13, 2021. In the agreed order, the parties agreed to share joint legal and physical custody of MC and to temporarily split the child's expenses equally. No child support was awarded to either party at that time. James also agreed to continue to cover both Mary's and MC's health insurance on a temporary basis. The temporary order further disposed of some of the parties' assets and liabilities.

A final hearing was held on the parties' complaints on May 26, 2022. At the outset of the hearing, Mary nonsuited her complaint for legal separation, waived corroboration of grounds, and indicated her agreement to the entry of a divorce. While the parties agreed to the resolution of some of the issues, remaining before the court were the issues of child support, the division of certain real property located in Hot Springs and Fayetteville, health insurance for MC, visitation over the Christmas holidays, and a determination on which parent would be the decision maker as to education. The only issues on appeal relate to child support and the division of the Hot Springs property.

Regarding the parties' income for purposes of child support, Mary testified that she currently worked for IQPC as director of sponsorship sales with a salary of $70,000. She denied receiving any income from Smart Investments or Smart Properties, LLC—two

businesses in which she holds a minority interest—and denied that money from those companies was deposited into her premarital Motors Finance account. Tax documents, including 2021 K-1s from both entities reflecting her share of taxable income, were introduced into evidence.

The Moores' 2019 and 2020 joint income-tax returns were introduced into evidence. The 2019 return showed "other income" of $92,265 and a tax liability of $34,892. The 2020 return listed income of $109,470. Both returns reflected income attributable to Mary from her interest in the Smart companies. Mary claimed that she paid the taxes on that income, not James, despite the parties' filing a joint return, and further denied that the income listed therein was available for their use as a family.

In her affidavit of financial means (AFM), Mary claimed she earned $5,541.67 a month in income from IQPC.  She reiterated that this amount did not include any income from Smart Investments or Smart Properties because she claimed that she did not "receive" any income from those companies. She further testified that her AFM did not include the approximately $92,000 shown on her 2019 tax return because she did not receive or live on that income. When asked if she paid taxes on that income, she responded that she did not know.

James also testified regarding his income for purposes of child-support computation. He testified that he had recently acquired a job as a teacher at Little Rock Christian Academy. He admitted that this change resulted in a decrease in salary but agreed to have child support calculated on the basis of his prior salary as the principal/director of E-Stem Junior High

3

School[1] in Little Rock. In agreeing to that, James asked the court to include in its child-support calculation either Mary's 2021 K-1 income or an average of her income from the K-1s that had been provided to the court. He introduced an AFM reflecting a monthly income of $6865.66.[2] A child-support worksheet supposedly utilizing those amounts was admitted into evidence for the court's consideration. That worksheet showed that James's monthly income was $6,833 a month.

Regarding the characterization of the Hot Springs property, Mary claimed that the property was hers individually and denied owning the home equally with James. She admitted that she and James had been married for three years when the property was purchased in December 2020 and that the warranty deed was issued from the sellers to "James Moore and Mary Corinne Smart Moore, husband and wife, as tenants by the entirety"; however, she claimed that the wording of the deed in both names was a mistake. She noted that they had not utilized a lawyer in the transaction, and the mistake was not discovered until after their separation in 2021 when she was preparing a trust for MC. She expressly denied that she intended to make a gift of the property to James and testified that, when she discovered the deed was in both names, she asked James to sign the deed over to her.

---

[1]In the testimony portion of the transcript, the name of the school is transcribed as East End. However, pay stubs submitted reflect that James was actually employed at E-Stem charter school.

[2]The AFM listed a bimonthly wage of $3207.83 and investment income of $450 a month.

As for the money used to purchase the Hot Springs property, Mary claimed that her father gifted $210,000 toward the purchase price and that the remaining $60,000 came from an inheritance she received from a cousin. The inheritance money was transferred from her individual checking account at Reliance Bank into an account at Bank OZK and was ultimately placed into the Garland County Title escrow account for the purchase of the property. There was also evidence that the $60,000 was at some point placed in the Motors Finance account.

James testified that he believed the property was intended to be "family" property and treated it as such. He performed work on the property; he paid utility bills until their separation; he paid the insurance on the home for almost a year; and he paid to repair the air-conditioning unit. He maintained that he would not have invested the time, effort, and money in the property otherwise. When questioned, Mary admitted that she had no personal knowledge of what James had actually contributed to the property.

Mary's father, Richard Lee Smart, Jr., testified that, in order to give Mary money to purchase the property, he took out a signature loan for $210,000; that he wired the money directly to the closing agent; that the money was intended to be a gift only to his daughter; and that he was unaware that the deed included the names of both James and Mary. He denied that James had paid anything for the property and claimed that James had told him that he did not want any part of the lake house. He did admit, however, that he had no idea whether James had paid the utilities or insurance on the home or whether he had made any other contribution to the home.

The court later entered a decree granting James a divorce from Mary. As for child support, the court ordered Mary to pay James $1,174 in monthly support beginning June 1, 2022. As for the Hot Springs property, the court found the property to be marital, but concluded that $210,000[3] was a gift toward the purchase with the parties contributing the remaining $60,000. The court found the $60,000 the parties contributed to be marital funds because Mary deposited her entire inheritance into an account she otherwise used for marital purposes before transferring the funds to purchase the property. Mary was awarded the home, but the court ordered Mary to pay James half of the value of the home, less the $210,000 gift from her father.

Mary appeals from the divorce decree, arguing that the Pulaski County Circuit Court abused its discretion in its calculation of child support and erred in its characterization of certain funds used to purchase the Hot Springs property as marital.

I. *Child Support*

Mary first argues that the circuit court erred in its child-support calculations, claiming the court improperly included pass-through business income in its calculation of child support and that it incorrectly offset the parties' respective child-support obligations. She further argues that the court's child-support calculation is facially incorrect and not supported by the child-support worksheet.

---

[3]The decree actually recites an amount of $211,000. The actual amount is irrelevant for our purposes.

6

Our standard of review for an appeal from a child-support order is de novo on the record, and we will not reverse a finding of fact by the circuit court unless it is clearly erroneous. *Slayton v. Dill*, 2024 Ark. App. 372, 691 S.W.3d 279. In reviewing a circuit court's findings, we give due deference to that court's superior position to determine the credibility of the witnesses and the weight to be accorded to their testimony. *Id.* As a rule, when the amount of child support is at issue, we will not reverse the circuit court absent an abuse of discretion; however, a circuit court's conclusion of law is given no deference on appeal. *Id.*

## A. Pass-Through Income

On appeal, Mary argues that the circuit court improperly included pass-through income as income in its child-support calculations. She argues that, while the income was reflected on her tax documents, it was "undisputed" that she did not receive this money and did not have access to it. Accordingly, it was not "expendable income" available to her and, thus, should not have been included in her gross income for child-support purposes. She further claims that the circuit court never found that she actually received this income; therefore, the court mechanically used the income reported on her tax returns as the basis for its decision.

In support of her argument, she notes that she has a minority interest in both Smart companies with a very small percentage of ownership; that there was no evidence that she made any decisions for either company; that the funds reflected in the K-1s are retained by the company and are not distributed; and that she had testified that she did not receive any income from either company. She further notes that, while her 2021 Arkansas K-1 from

7

Smart Properties showed a net income of $92,320, her federal K-1 for the same year reflected a net loss. She argues that James did not dispute her testimony or point to any evidence that Mary had actually received any other distributions from the two companies. She also notes that the parties received financial assistance for day care at one point during their separation.

In determining an appropriate amount of child support, courts are to refer to the most recent revision of the family-support chart in Arkansas Supreme Court Administrative Order No. 10, which provides a means of calculating child support on the basis of the payor's net income. Ark. Code Ann. § 9-12-312(a)(3)(A) (Repl. 2020). The definition of "income" is "intentionally broad and is designed to encompass the widest range of sources consistent with this State's policy to interpret 'income' broadly for the benefit of the child." Ark. Sup. Ct. Admin. Order No. 10(III)(2) (2022).

As for the inclusion of retained earnings, the version of Administrative Order No. 10 in effect at the time of the divorce provided that gross income for purposes of child-support calculations includes "[e]arnings generated from a business, partnership, contract, self-employment, or other similar arrangement" but cautioned that "[i]ncome (or losses) from a corporation should be carefully examined to determine the extent to which they were historically passed on to the parent or used merely as a tax strategy." Ark. Sup. Ct. Admin. Order No. 10(III)(2)(ii). More specifically, Administrative Order No. 10 acknowledged the difficulty in determining income for self-employed individuals, business owners, and others because (1) those types of individuals often have types of income and expenses not frequently encountered when determining income for most people; (2) taxation rules, business records,

8

and forms associated with business ownership and self-employment differ from those that apply to individuals employed by others; and (3) due to the control that business owners or executives exercise over the form and manner of their compensations, a parent, or a parent with the cooperation of a business owner or executive, may arrange compensation to reduce the amount visible to others looking for a common source of income. Ark. Sup. Ct. Admin. Order No. 10(III)(3)(a). Income that is subject to elective status (for example, retained income) may be considered as income after the court considers the circumstances and history of the elective treatment, which includes, but is not limited to, the status prior to the implementation of the support order. Ark. Sup. Ct. Admin. Order No. 10(III)(3)(h). If a change in the status was made after the original election, then a court can choose either to include the income in child-support calculations or not to include it in the calculations. *Id.*

Here, the court was provided with the parties' 2019 and 2020 joint income-tax returns and the 2021 K-1s associated with the Smart companies. Their joint tax returns in those years listed taxable income attributable to Mary's ownership in the Smart companies. The 2021 K-1s also reflected that Mary received a $34,000 distribution from Smart Properties, LLC, which Mary asserted was necessary to pay income taxes for that year. It appears from the K-1 that in 2021, the business made an election under the tax code that may have prompted the distribution. However, Mary did not testify to this, nor did she present any expert witness or accountant to explain if the election alone necessitated the distribution. Rather, Mary testified that she had no control over the business decisions of either company and did not routinely receive payments from either company. James presented no physical

9

evidence other than the tax returns and K-1s to contradict her testimony. The court, in including the amounts in its calculation of Mary's gross income, stated that it was including those amounts because the parties paid income tax on those amounts. In so finding, the court clearly did not believe Mary's testimony that she did not receive any payments from the company or that she did not have the ability to access her share of that income, especially given the fact that she received a $34,000 distribution from Smart Properties in 2021. Given the broad definition of income and our deference to the circuit court on credibility determinations and the weight to be given evidence, we cannot say that the circuit court abused its discretion in the inclusion of those amounts.

## B. Offset

We next review Mary's argument that the court incorrectly ordered an offset of the child-support obligations resulting in her paying more than her share of additional child-rearing expenses. She claims that the circuit court should have initiated the offset prior to consideration of additional expenses.[4]

---

[4]Mary's argument appears to be based on the procedure for allocating child support in a shared-custody arrangement under the newest version of Administrative Order No. 10, which provides:

> 2. *Shared Custody Adjustment.* In cases where the parties share approximately an equal amount of time, the parties shall complete the Worksheet and Affidavit of Financial Means. The court shall then determine the basic child-support obligation by deducting the smaller obligation from the larger obligation as determined in "Part II: Basic Obligation" of the Child Support Worksheet. Once the basic child-support obligation has been determined, if the court determines there are Additional Monthly Child-Rearing Expenses that must be accounted for in Part III of the Child Support Worksheet, the court shall refer to "Line 10: Share of additional child-rearing

Mary's argument, however, has no merit—the circuit court simply applied Administrative Order No. 10 and exercised its authority to adjust the child-support amount in consideration of their joint custody. In order to demonstrate that the ruling was erroneous, Mary must show that the circuit court abused its discretion by making a decision that was arbitrary or groundless. *Grynwald v. Grynwald*, 2022 Ark. App. 310, 651 S.W.3d 177; *Kelly v. Kelly*, 2014 Ark. 543 at 5–6, 453 S.W.3d 655, 660. She cannot do so. Here, the court adhered to the version of Administrative Order No. 10(V)(1) that was in effect when the decree was entered and followed the method set forth in the child-support-worksheet form supplied by Administrative Order No. 10.

Pursuant to the chart, Mary's child support was calculated as $1,280.37 a month. Her share of the health-insurance expense was $198.20, resulting in a total child-support obligation of $1,478.57. Following the "sample" child-support calculation recited in Administrative Order No. 10 as a guide or template, the calculations should have ended there. However, in an effort to offset the amount for the joint-custody arrangement, the circuit court then reduced the amount of child support Mary was required to pay by subtracting the amount that James would owe if he were required to pay her child support. Therefore, instead of Mary being required to pay child support of $1,478.57 a month, the

expenses" to determine what adjustment, if any, should be made to the basic child-support obligation.

This version of Administrative Order No. 10, however, was not in effect at the time support was ordered.

11

circuit court reduced her obligation to $1174 a month by taking into consideration the parties' joint-custody arrangement. Thus, Mary actually benefited from an offset the court was not required to give. Since the court's decision was based on the application of Administrative Order No. 10 and the model child-support worksheet that accompanied it, its decision was neither arbitrary nor groundless.

## C. Calculation of Income

As for Mary's argument that the child-support calculation in the decree is facially incorrect and not supported by a child-support worksheet, we agree. In the decree, the court listed Mary's monthly gross income available for support as $17,403.58 and James's gross imputed income for support as $6,383.33 for a total support amount of $24,236.91. James's gross income should have been listed as $6,833.33, which is consistent with the information presented at trial and consistent with the total support amount calculated in the decree. The decree then lists the basic support obligation as $1,248, when the actual amount according to the guidelines should be $1,783. However, this is clearly another clerical error because the decree then correctly calculates the parties' share of the support obligation using the $1,783 amount. Accordingly, we reverse and remand for the correction of the clerical errors contained therein.

## II. *Property Division*

Mary next challenges the court's characterization and division of the Hot Springs property. The purchase price was $270,000.[5] It is undisputed that the purchase of that property was funded in part by a $210,000 gift from Mary's father and in part by a $60,000 inheritance Mary received upon the death of her cousin.[6] It is also undisputed that the property was placed in both Mary's and James's names as husband and wife and as tenants by the entirety. In the decree, the court found the property to be a marital asset and divided the equity in the property equally after deducting Mary's $210,000 gift from her father. The court then ordered Mary to pay James the value of his equity in the home and ordered James to quitclaim his interest in the property to Mary.

A circuit court's findings of fact with respect to division of property in domestic-relations cases will be affirmed unless clearly erroneous or clearly against the preponderance of the evidence. *Baker v. Baker*, 2013 Ark. App. 543, 429 S.W.3d 389. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that the circuit court has made a mistake. *Hunter v. Haunert*, 101 Ark. App. 93, 270 S.W.3d 339 (2007). In reviewing a circuit court's findings of fact, we give due deference to the circuit court's superior position to determine the credibility of

---

[5]The record sometimes indicates the purchase price was $260,000 and sometimes $270,000. The actual purchase is not relevant to the issues on appeal.

[6]There was also testimony that a portion of the closing costs, approximately $460, was paid by personal check. Since there was no argument that this check affected the marital/nonmarital characterization of the property, it is not discussed here.

witnesses and the weight to be accorded their testimony. *Fletcher v. Stewart*, 2015 Ark. App. 105, 456 S.W.3d 378.

The case before us involves the interplay between two presumptions, an exception, and the role of tracing nonmarital funds.

Division of property at the time of divorce is governed by Arkansas Code Annotated section 9-12-315 (Repl. 2020), and it requires that all marital property be divided evenly unless the circuit court finds such a division to be inequitable. There is a presumption that all property acquired during the marriage is marital property. *Barron v. Barron*, 2015 Ark. App. 215; *McDermott v. McDermott*, 336 Ark. 557, 986 S.W.2d 843 (1999). Because the Hot Springs property in this case was acquired during the marriage, it is presumed marital.

The presumption that all property acquired during the marriage is marital property is, however, subject to certain statutory exceptions. *Barron*, *supra*. One such exception is property acquired by gift or inheritance. Arkansas Code Annotated section 9-12-315(b) exempts from the definition of "marital property" property that is acquired by gift or inheritance; acquired in exchange for property acquired by gift or inheritance; and the increase in value of such property. Ark. Code Ann. § 9-12-315(b).

Here, the parties agree that the $60,000 used to purchase the Hot Springs property was inherited. It is further undisputed that the $60,000 was first placed in a premarital account in Mary's name. The question then becomes whether its use in the purchase of that property resulted in a $60,000 gift to the marriage or whether it retained its separate character through all its transfers.

In determining whether property remains under the control of one spouse upon divorce or is the property of both spouses, "tracing" may be used by the court. *McKay v. McKay*, 340 Ark. 171, 8 S.W.3d 525 (2000). One claiming ownership of nonmarital property that has been commingled with marital property bears the burden of tracing the separate property so that it can be treated as such for property-division purposes upon divorce. *Scott v. Scott*, 86 Ark. App. 120, 161 S.W.3d 307 (2004). However, the tracing of money or property into different forms is not to be considered an end in itself, and the fact that a spouse made contributions to certain property does not necessarily require that those contributions be recognized in the property division upon divorce. *Barron*, 2015 Ark. App. 215. When transactions result in great difficulty in tracing the manner in which nonmarital and marital property have been commingled, the property acquired in the final transaction may be declared marital property. *Karolchyk v. Karolchyk*, 2018 Ark. App. 555, 565 S.W.3d 531; *Ellis v. Ellis*, 2017 Ark. App. 661, 536 S.W.3d 166.

Additionally, the person claiming ownership of nonmarital property that has been commingled and placed in the names of both spouses also must overcome the presumption that there has been a gift of the interest in the nonmarital property. We have stated that the fact that consideration given for property taken in the two names belonged to only one spouse is of little, if any, significance when that spouse is responsible for the property being taken in both names, as the presumption is that there was a gift of an interest. *Bradford*, *supra.* The burden is on the party who asserts an interest in the property to establish that it is, in fact, separate property not subject to division. *Id.*

15

The circuit court in this case, however, never reached the issue of whether the use of Mary's inheritance in the purchase of that property resulted in a $60,000 gift to the marriage or whether it retained its separate character because it incorrectly found that those funds were converted into marital funds after they were deposited into Mary's Motors Finance account. More specifically, the court found that because Mary's nonmarital inheritance was deposited into a nonmarital account that was occasionally used to pay for marital expenses, those nonmarital funds became marital.[7] This is incorrect. As Mary pointed out, in *Karolchyk*, 2018 Ark. App. 555, 565 S.W.3d 531, we found that the mere pouring of nonmarital funds in to and out of a joint checking account *does not* render them forever funds owned by the entirety. Here, the tracing process is even more attenuated. The Motor Credit account in which the inherited funds were deposited was not a joint account but was held in Mary's name only. Thus, the fact that the nonmarital account was used to pay marital expenses did not automatically convert the nonmarital account into a marital account.

As stated above, the tracing of money or property into different forms is not to be considered an end in itself, and the fact that a spouse made contributions to certain property does not necessarily require that those contributions be recognized in the property division upon divorce. *Id.*; *Robinson v. Lindsey*, 2015 Ark. App. 148. However, the circuit court never went through this analysis or made the appropriate factual findings for our review because it

---

[7]We note the contradiction in the court's decree wherein it found that $60,000 of the inheritance placed in the Motor Credit account that was used to purchase the property was marital, but the remaining $40,000 of the inheritance was nonmarital.

incorrectly found that the $60,000 had become marital property simply because it was deposited into an account that was sometimes used for marital purposes. Nor did the court make any factual determination as to whether Mary rebutted the presumption that she made a gift of the $60,000 when she used that money to purchase property that was placed in the names of both spouses. Accordingly, we reverse and remand for the circuit court to reconsider the division of the Hot Springs property after applying the correct standards as set forth herein.

Affirmed in part; reversed and remanded in part; and remanded for correction of clerical errors.

HIXSON and MURPHY, JJ., agree.

*Mann & Kemp, PLLC*, by: *Angela Mann*, for appellant.

*Robertson, Oswalt & Nony*, by: *Chris Oswalt*, for appellee.