Cite as 2025 Ark. App. 465

# ARKANSAS COURT OF APPEALS

DIVISION II
No. CV-24-345

| | | |
|---|---|---|
| RICHARD VALLIS | | Opinion Delivered October 1, 2025 |
| | APPELLANT | |
| | | APPEAL FROM THE SEBASTIAN COUNTY |
| V. | | CIRCUIT COURT, FORT SMITH |
| | | DISTRICT |
| MARILYN VALLIS | | [NO. 66FDR-23-555] |
| | APPELLEE | |
| | | HONORABLE SHANNON L. BLATT, |
| | | JUDGE |
| | | |
| | | AFFIRMED |

**KENNETH S. HIXSON, Judge**

Appellant Richard Vallis (Rick) appeals after the Sebastian County Circuit Court entered a divorce decree and other orders in favor of appellee Marilyn Vallis (Marilyn). On appeal, Rick argues that (1) the circuit court erred in finding that certain property was marital property; (2) the circuit court erred in allocating all the residence-loan debt to him and not giving him any credit for the debt that was owed to his single-member LLC; and (3) the circuit court did not state its basis and reasons for making an unequal distribution of marital property. We affirm.

I. *Relevant Facts*

Rick and Marilyn were married on August 24, 2012, and separated in October 2021. They have one minor child (MC). Marilyn filed her complaint for divorce on July 27, 2023. In her complaint, she asked to be granted a divorce, awarded primary custody of MC,

awarded spousal support, and for their property to be divided. Rick filed an answer asking that Marilyn's complaint be denied. On August 8, 2023, Marilyn filed a motion for a hearing to set temporary child support and spousal support and maintenance.[1]

At the hearing for temporary support on September 20, 2023, Rick testified that he is the sole owner of California Customs, LLC (hereinafter, "California Customs" or "company"). Rick stated that he took a salary of $3,500 a week but keeps any remaining earnings in the "company for growth." When asked whether the admitted tax returns were his personal returns or the company's returns, he said that they were "basically one and the same." Rick admitted that the company's income is reported on his personal tax returns on a Form K-1. Rick agreed that his net income according to his return in 2019 was $573,000 and that he had a 2020 K-1 distribution of $202,000. Rick further stated that he would not argue with counsel's statement that his total income in 2021 was approximately $440,000.

Rick admitted that he recently, during the separation, sold some stock from his personal investment accounts[2] and purchased a residence. He lived in the new residence with his girlfriend. At the time of the hearing, he said that he was giving Marilyn a check from his company for $800 a week. Rick admitted that he takes "cash out of the company

---

[1]Because the issues on appeal are limited to the division of marital property, we limit our discussion of the other issues resolved by the circuit court, including issues of child custody, child support, and spousal support.

[2]We acknowledge that our record refers to "retirement accounts," "stock accounts," "IRAs," "accounts," "Edward Jones accounts," and "investment accounts." Rick concedes on appeal that these terms were used interchangeably. For simplicity, we use the term "investment accounts."

for personal expenses or petty cash." Although he said he currently did not keep a ledger, he admitted that he has used a ledger in the past. He would keep cash on hand from his business or gambling winnings in a safe.

On cross-examination, Rick testified that although he claimed business income on his tax return, most of the income was retained in the company. He also said that the company has money in his personal investment accounts. Marilyn continued to live in the marital residence, which Rick thought was comparable in value to the residence that Rick recently purchased. Rick testified that he purchased Marilyn's vehicle (the Range Rover) "for her" and pays taxes and insurance on both the vehicle and the marital residence. A spreadsheet of the expenses Rick paid was admitted into evidence without objection.

Marilyn testified that she was not working but was studying surgical technology. She admitted that Rick was sending her a check for $800 a month from his business. She thought her monthly expenses were $13,825 a month but did not have access to their "marital money." She admitted that she was not contending that the company itself was a marital asset; however, she said that she did contend that the profit from the company was marital because Rick "commingles it." Much of Marilyn's testimony related to her expenses during the separation and the care and support of MC, which are not relevant to this appeal.

After the hearing, the circuit court filed a temporary order on September 22, 2023, and an amended temporary order on September 25, 2023. The circuit court awarded Marilyn temporary possession of the marital residence and set temporary spousal support,

child support, and child custody. The specific findings of these orders are not relevant to this appeal.

A final hearing on the outstanding issues was held on February 14, 2024.[3] Marilyn testified that the parties have lived separate and apart from each other for at least eighteen months. During the separation, Marilyn continued to live in the marital residence on Carleton Place (hereinafter referred to as "Carleton Place residence" or "marital residence") with MC. She had one vehicle in her possession, a 2021 Range Rover Velar (Range Rover). Marilyn acknowledged that since the separation, Rick purchased his residence on Ridgefield Drive (hereinafter referred as "Ridgefield Drive residence") and spent money remodeling that residence. She asked the circuit court to consider an inequitable distribution "as a result of the money that was spent on the new residence." She asked that the various investment accounts be awarded to her. She contended that the funds in the investment accounts were "our money" and that those marital funds were used to pay for the Ridgefield Drive residence. An IRA account was also set up for her during the marriage that contained approximately $22,000 to $26,000. She wanted any funds set up for MC to remain for MC. Regarding her marital contributions, Marilyn testified that she was an employee at California Customs during the marriage and aided in the company's growth. She agreed that she was not a shareholder of the company and that she had incurred credit-card debt.

---

[3]Because division of the marital property is the only issue on appeal, we limit our discussion of the facts and evidence presented at the final hearing to this issue.

Regarding the Range Rover, Marilyn admitted that it was not a marital asset but was owned by California Customs and that she was fine with it being sold. Marilyn clarified that although she was not asking the circuit court to award her an ownership interest in California Customs, she was asking the circuit court to "consider the income that Rick makes from that when determining what, if anything, [she is] entitled to."[4]

The documents admitted at the temporary hearing were also admitted at the final hearing without objection.

Rick testified that he purchased the Ridgefield Drive residence for $755,000 cash and has been doing some work on it. He said that he borrowed a total of $115,494.24 as a loan from his company to purchase, complete the remodeling of, and furnish the residence. He admitted that the loans were not memorialized in any document. Rick said he also took a loan from his company to purchase the marital Carleton Place residence, and there was $184,090.43 remaining on that loan.[5] Rick stated that the parties spent approximately $40,000 on the drapes and window dressings and another $45,000 on the billiards room in the marital residence. He thought both the marital residence and the Ridgefield Drive residence were roughly equal in value even though the Ridgefield Drive residence was a little bigger.

---

[4]We offer no opinion whether Marilyn was entitled to be awarded any interest in the company or its retained earnings since neither argument was advanced by Marilyn.

[5]Neither residence is encumbered by a mortgage.

Rick explained that he started California Customs in 1997. The parties were married in 2012. Marilyn worked for the company approximately eight or nine years. He still took a salary of $3,500 a week. Rick stated that he is responsible for paying the taxes on the K-1, but he said that the business retains most of those earnings. He agreed that he could take the earnings as distributions but chose not to do so. That said, his company paid for both his and Marilyn's vehicles. Rick also admitted that he sometimes uses the company credit card for some personal expenses. He takes cash out of the company and keeps it in a "cash bag," some of which was used for various purchases, including purchases for his Ridgefield Drive residence.

Regarding the investment accounts, Rick testified that they were owned by him and that they were "started during [his] marriage to Marilyn." Rick stated that he had an account before their marriage that was transferred. Rick testified that a California Customs Account Quick Report, admitted as defendant's exhibit 4, reflected amounts transferred from the company to Rick's personal investment accounts. According to that document, the first "member draw" for $50,000 occurred on January 20, 2012, and went to an "Edward Jones Investment" account. There is no other specific information about that transaction. The other draws occurred between April 13, 2018, and December 2, 2022, clearly within the marriage. Rick said that the money transferred belonged to the company. When Marilyn's counsel asked Rick more about this document, Rick admitted that the transfers to the investment accounts were categorized as "members draw[s]." Marilyn's counsel asked whether it was therefore considered income that he took out of the business, and Rick

6

responded, "No. That was actually ‑‑ that may have been mislabeled, but that was invested on behalf of California Customs." Rick said that his secretary was the one who categorized the allocation and further stated, "[I]f I would have thought that would have went against anything that I'm testifying to, I could have simply had it changed before I provided it to you."

While separated from Marilyn, Rick also purchased a bass boat. He explained that he sold a previous boat and placed the money in "our stock market, which is now the benefit of both of us." Rick testified that he took out debt on the new boat and still owes $66,084.71 on the boat he purchased; however, it is no longer worth that amount.

Regarding the Range Rover vehicle that was in Marilyn's possession, Rick agreed that it was registered in his company's name. However, when asked whether Rick wanted the vehicle to go back to his company, Rick stated, "No. My intentions from day one was to give her that vehicle. She needs a good reliable vehicle for my daughter, and my intention was never to try to take that vehicle."

Defendant's exhibit 10 was admitted into evidence without objection and shows the funds in the investment accounts. Rick testified that he established a college fund for his daughter, which was also reflected on that document. Although he was contributing to the college fund weekly, he stopped making those contributions because his company was not doing well after losing wholesale customers and employees. He said his company was not profitable but that he was hoping to make adjustments and make it profitable again. Rick agreed he had approximately $1.7 million in the investment accounts and $900,000 in the

company's business account. He also agreed that any loans from the company were essentially money that he owed himself since the company was a single-member LLC.

Brittany Hurst, Rick's former girlfriend, testified that she had lived with Rick in the Ridgefield Drive residence after Marilyn and Rick separated. She said that Rick remodeled the residence and would take her on vacations when they were together. She estimated that Rick paid 75 percent of "everything." Ms. Hurst moved out of the residence in December 2023.

At the conclusion of the hearing, Marilyn's counsel argued in relevant part that the real estate and personal property should be sold and the proceeds divided equally. Marilyn's counsel contended that Rick's testimony that the company issued loans was "nothing [more than] a piece of paper" that could be "deleted with the stroke of a key and they don't exist." Marilyn's counsel further argued that the investment accounts should be considered marital assets. Regarding the Range Rover, Marilyn's counsel stated that because Rick testified that Marilyn should be able to keep the vehicle, Rick should be ordered to transfer title to her.

Rick's counsel argued, inter alia, that even though Rick stated Marilyn can have the Range Rover, he should receive a $40,000 credit because it is a nonmarital asset. Rick's counsel asked that Rick be granted an unequal division of property in his favor because Rick was "responsible for any acquisition or growth of marital property." He asked that Rick receive credits for any loans from the company and disagreed that the investment accounts were marital.

8

After hearing oral argument, the circuit court announced the following relevant oral findings:

> With regard to the real estate, the Court finds that the parties acquired real estate during the marriage, and the Court finds that, based on the testimony, that the value of each home is approximately equal in value, and the Court finds that each party will be awarded their separate home as their separate property. And when I say that, I'm calling it their separate homes based on where the two parties have been living.
>
> . . . .
>
> With regard to personal property, the Court finds that each party shall be awarded the separate property in their separate possession. [Rick] has agreed to sign the title to the Range Rover to [Marilyn] and shall do so.
>
> . . . .
>
> [Marilyn] and [Rick]'s remaining IRAs and retirement accounts shall be divided equally from the date of marriage through today.
>
> With regard to debts, [Rick] shall reimburse [Marilyn] for the Dr. Sills' account, I believe that amount was 275, the Quest Lab bill for 330.44, and the carpet cleaning in the amount of 381.06. The ~ I think I've already said [Rick] will be responsible for the boat debt.
>
> And the Court is also going to order that [Rick] be responsible for the loans on both homes that are owed to the business. [Marilyn] will be responsible for her credit card debt.

The circuit court filed the divorce decree on March 11, 2024, making the following relevant findings:

> 2.      The motion for contempt is denied.
>
> 3.      [Marilyn] is awarded an absolute divorce, based on the grounds of 18 (eighteen) months continuous separation.
>
> . . . .

9

8. [Marilyn] is hereby awarded the property located at 2112 Carleton Pl, Fort Smith, Arkansas 72908. [Rick] shall be responsible for any debt associated therewith.

9. [Rick] is hereby awarded the property located at 12007 Ridgefield Dr. Fort Smith, Arkansas 72903. [Rick] shall be responsible for any debt associated therewith.

10. Each party shall be awarded the separate property in their separate possession.

   a. [Rick] shall sign over ownership of the Range Rover to [Marilyn] within 10 days of the execution of this order.

   b. [Marilyn] shall be responsible for her credit card debt.

   c. [Rick] is awarded the boat and shall be responsible for the debt associated with it.

11. The custodial account for the minor child and the 529 plan shall continue for the benefit of the minor child and [Rick] shall be responsible for those accounts.

12. [Marilyn] and [Rick's] remaining IRAs and retirement accounts shall be divided equally from the date of marriage through today.

13. [Rick] shall reimburse [Marilyn] for the Dr. Sills' account in the amount of $275.00, the Quest Labs bill in the amount of $330.44 and the carpet cleaning in the amount of $381.06.

14. [Rick] shall be responsible for the loans on both homes that are owed to the business.

15. The parties shall file 2023 taxes jointly and [Rick] shall be responsible for any tax liability owed.

16. [Rick] shall pay $3,500.00 per month in spousal support, with the last payment due August 1, 2024.

A postdivorce hearing regarding a motion to stay and for attorney's fees was held on May 8, 2024. Although those motions are not relevant to the issues on appeal, counsel for both parties also discussed the need for an order clarifying two other issues at that hearing. They asked the circuit court to enter an order clarifying that the circuit court meant to deny both pending contempt motions and clarifying whether the circuit court found the assets divided in the divorce decree to be marital property. The circuit court explicitly stated that it did not have its notes from the divorce hearing. However, counsel for both parties agreed and represented that they thought what the circuit court divided was found to be marital property.

After the postdivorce hearing, the circuit court filed three additional orders on May 13, 2024. In those orders, the circuit court granted a stay pending appeal; clarified that it was denying both the December 18, 2023, and the January 31, 2024, motions for contempt; clarified that it found the property and debt discussed in paragraphs 8 through 12 and 14 of the divorce decree to be marital; and ordered Rick to pay $15,000 in attorney's fees and costs to Marilyn. This appeal followed.

## II. *Standard of Review*

On appeal, this court reviews divorce cases de novo on the record. *Taylor v. Taylor*, 369 Ark. 31, 250 S.W.3d 232 (2007). Moreover, we will not reverse a circuit court's finding of fact in a divorce case unless it is clearly erroneous. *Id.* A finding is clearly erroneous when the reviewing court, on the entire evidence, is left with a definite and firm conviction that a mistake has been made. *Chekuri v. Nekkalapudi*, 2020 Ark. 74, 593 S.W.3d 467. We also

11

give due deference to the circuit court's determination of the credibility of the witnesses and the weight to be given to their testimony. *Id.*

Arkansas Code Annotated section 9-12-315(b) (Repl. 2020) defines marital property as "all property acquired by either spouse subsequent to the marriage." There is a presumption that all property acquired during a marriage is marital property. *Ellis v. Ellis*, 2017 Ark. App. 661, 536 S.W.3d 166. Once one party has shown that property was acquired during the marriage, the burden shifts to the other party to prove by clear and convincing evidence that the property is nonmarital. *Id.*

In accordance with Arkansas Code Annotated section 9-12-315(a)(1), upon entry of a divorce decree, the circuit court shall equally distribute all marital property one-half to each party unless it is determined that such a distribution would be inequitable; if the property is not divided equally, then the circuit court must state the reasons and bases for not doing so, and the bases and reasons should be recited in the order entered in the matter. *Chambers v. Chambers*, 2017 Ark. App. 429, 527 S.W.3d 1. Factors to be considered by the circuit court in the event that the marital property is not divided equally include the length of the marriage; the age, health, and station in life of the parties; the occupation of the parties; the amount and sources of income available to each party; vocational skills; employability; the estate, liabilities, and needs of each party and opportunity of each for further acquisition of capital assets and income; contribution of each party in acquisition, preservation, or appreciation of marital property, including homemaker services; and the federal income tax consequences of the court's division of property. Ark. Code Ann. § 9-12-315(a)(1)(A). All

12

nonmarital property shall be returned to the party owning it prior to marriage unless the circuit court makes another division it deems equitable, after taking into consideration the factors set forth in subdivision (a)(1) and stating in writing its basis and reasons for not returning the property to the party who owned it at the time of the marriage. Ark. Code Ann. § 9-12-315(a)(2).

Our appellate courts have consistently interpreted section 9-12-315(a) to grant the circuit court broad powers in distributing both nonmarital and marital property to achieve an equitable division. *Moore v. Moore*, 2019 Ark. 216, 576 S.W.3d 15. We have held that any exception to the rule of equal distribution will always depend on the specific facts as reflected by the circuit court's findings and conclusions. *Kelly v. Kelly*, 2014 Ark. 543, 453 S.W.3d 655. The circuit court is vested with a measure of flexibility in apportioning the total assets held in the marital estate upon divorce, and the critical inquiry is how the total assets are divided. *Jones v. Jones*, 2014 Ark. 96, 432 S.W.3d 36. The overriding purpose of the property-division statute is to enable the court to make a division that is fair and equitable under the circumstances. *Id.* Marital property cannot always be divided exactly equally and in kind. *Id.* Stated differently, the property-division statute does not compel mathematical precision in the distribution of property; it simply requires that marital property be distributed equitably. *Id.* We will not substitute our judgment on appeal as to the exact interest each party should have but will decide only whether the order is clearly wrong. *Id.*

III. *Marital Property*

On appeal, Rick first argues that the circuit court erred in finding that his investment accounts, the Ridgefield Drive residence, and the Range Rover were marital property. We address each asset individually.

## A. Investment Accounts

Rick argues that the circuit court erred in finding that the investment accounts were marital property. He argues that California Customs deposited $50,000 into the accounts before the marriage and another $283,146.16 during the marriage. Rick argues that regardless of whether the money still belonged to the company or were member draws to him personally, the money and growth should be nonmarital property. We disagree.

The parties did not dispute whether California Customs itself and its retained income in its business accounts were nonmarital.[6] Instead, the parties disputed the characterization of the deposits into the investment accounts that were in Rick's personal name. Marilyn contended that those accounts were marital property.

Rick testified that the investment accounts were "started during [his] marriage to Marilyn" except the Edward D. Jones account discussed below. The only documentation Rick provided regarding some of the deposits in the investment accounts was a report from California Customs, defendant's exhibit 4. At one point, Rick testified that California Customs was making business investments through his personal investment accounts and that the money in the investment accounts therefore belonged to California Customs.

---

[6]See footnote 4.

14

However, Rick also admitted that he sold a boat and put the proceeds from that sale into the investment accounts, which was for the benefit of both parties. Further, defendant's exhibit 4 did not indicate that California Customs was making business investments but categorized the transactions as "member draws." When Marilyn's counsel asked whether the transactions could therefore be considered income that Rick was taking out of the company, Rick stated that his secretary "mislabeled" the transactions and that he "could have simply had it changed" before he provided it. According to defendant's exhibit 4, the first "member draw" for $50,000 occurred on January 20, 2012, which was before the marriage. However, the notation was that the member draw was sent to an "Edward Jones Investment" account. There is no other specific information about that transaction or whether that account was the same investment account that Rick had previously stated started during the marriage or was the account Rick said was later transferred to the investment accounts started during the marriage. Even if that money went into an account that was later transferred to the investment accounts started during the marriage, there is no documentation of how much was transferred or into which account.

Rick compares the facts of his case to those in *Dalrymple v. Dalrymple*, 74 Ark. App. 372, 47 S.W.3d 920 (2001), and *Reed v. Reed*, 24 Ark. App. 85, 749 S.W.2d 335 (1988). We disagree. In *Dalrymple*, appellee ran a sole proprietorship for approximately thirty years. Eighteen months after his marriage to appellant, appellee transferred the assets of his premarital sole proprietorship to Dalrymple Insurance Agency, Inc., in exchange for corporate stock. We affirmed the circuit court's decision that the stock appellee received in

15

exchange from the premarital business assets was nonmarital property. In doing so, we listed the following factors in our analysis:

> First, appellee testified that he used strictly nonmarital funds to acquire the stock. This testimony was not disputed by appellant. When the issue is whether a source of funds is marital or nonmarital, we defer to the chancellor's superior position to resolve credibility questions pertaining to the issue. *See Wright v. Wright*, 29 Ark. App. 20, 779 S.W.2d 183 (1989). Second, appellee had operated the business as his own for thirty years before he married the appellant. It is therefore unlikely that, by changing the business from a sole proprietorship to a closely held corporation for tax purposes, he intended to change its status from nonmarital to marital property. Third, the stock certificates were issued solely to appellee, a factor considered significant in *Cate v. Cate*, 35 Ark. App. 79, 812 S.W.2d 697 (1991). Fourth, as already discussed, there was no evidence that business and personal funds were commingled. Finally, the assignment and tax documents reflected appellee's intention that the acquisition of stock be accomplished solely by the transfer of business assets. In light of these factors, we affirm the chancellor's decision that the corporation was nonmarital property.

*Dalrymple*, 74 Ark. App. at 377, 47 S.W.3d at 923.

Rick correctly notes that *Reed* involved a wife who inherited property during the marriage. In relevant part, *Reed* held that proceeds from the sale of that inherited property that was placed in the wife's separate name was nonmarital property. Neither case is analogous to the facts before us.

Here, the circuit court was not required to believe Rick's self-serving testimony that the money he directly received from California Customs and placed in his personal investment accounts was not his in light of the other conflicting evidence. Defendant's exhibit 4 categorized the transactions as "member draws." Further, even though the accounts were titled in his individual name, Rick testified that they were started during the marriage and admitted at one point that the investment accounts benefited both parties. The record

16

reflects that the deposits Rick made into the investment accounts were from earnings generated by California Customs during the marriage. Our appellate courts have repeatedly held that salary checks and stipends earned subsequent to the marriage are marital property. *See Day v. Day*, 281 Ark. 261, 663 S.W.2d 719 (1984); *Dial v. Dial*, 74 Ark. App. 30, 44 S.W.3d 768 (2001); *Reed, supra*. Even if the circuit court credited Rick's testimony that other premarital assets were transferred and commingled into the marital investment accounts, Rick bore the burden of tracing the separate property so that it can be treated as such for property-division purposes upon divorce. *Smart-Moore v. Moore*, 2024 Ark. App. 453, 699 S.W.3d 383; *Philmon v. Philmon*, 2023 Ark. App. 150, 662 S.W.3d 728. When transactions result in great difficulty in tracing the manner in which nonmarital and marital property have been commingled, the property acquired in the final transaction may be declared marital property. *Karolchyk v. Karolchyk*, 2018 Ark. App. 555, 565 S.W.3d 531; *Ellis v. Ellis*, 2017 Ark. App. 661, 536 S.W.3d 166. With the evidence presented in this case, we cannot say the circuit court clearly erred in finding that the investment accounts were marital property.

## B. Ridgefield Drive Residence

Rick next argues that the Ridgefield Drive residence was nonmarital property. He explains that he purchased the Ridgefield Drive residence using funds from the investment accounts and a loan from California Customs. He claims that the property should be nonmarital because the investment accounts were nonmarital property. Because we held there was no merit to Rick's argument that the investment accounts were nonmarital, this

17

argument likewise lacks merit.  Accordingly, we hold that the circuit court did not err in finding that the Ridgefield Drive residence was marital property, and we affirm on this point.

## C.  Range Rover

Rick argues that the circuit court erred in finding that the Range Rover was marital property and that he should have received a credit for the vehicle's value.  We agree that both parties conceded at the divorce hearing that the Range Rover was a nonmarital asset that was owned by Rick's company.  However, Rick also conceded that Marilyn should be awarded the vehicle because his "intentions from day one was to give her that vehicle."  Rick's counsel argued that although Marilyn should be awarded the vehicle, Rick should be credited for the vehicle's value in the property division.  In its oral findings, the circuit court stated the following: "With regard to personal property, the Court finds that each party shall be awarded the separate property in their separate possession.  The defendant has agreed to sign the title to the Range Rover to the plaintiff and shall do so."  The divorce decree memorialized those same findings.  The divorce decree awarded Rick property that he had in his possession, including the Ridgefield Drive residence that he purchased and remodeled and the boat he purchased with marital funds.

Having said that, Rick's real argument is not that the Range Rover should not be awarded to Marilyn—Rick conceded this point at the hearing.  His real argument is that the circuit court erred in failing to award him some type of credit for the current value of the Range Rover in the court's calculation of the equal distribution of property.

18

We acknowledge that the circuit court was mistaken to the extent it found that the Range Rover was marital property in its postjudgment order filed on May 13, 2024. However, that order was the result of the circuit court's postdivorce hearing on May 8, 2024. At that hearing, counsel for both parties asked the circuit court to clarify whether it found the assets divided in the divorce decree to be marital property. The circuit court explicitly stated that it did not have its notes from the divorce hearing. However, counsel for both parties agreed and represented that they thought what the circuit court divided was found to be marital property. Rick now argues that the circuit court's subsequent finding was in error because both parties previously conceded that the Range Rover was a nonmarital asset. However, we have previously held that an appellant cannot complain on appeal that the circuit court erred if the appellant induced, consented to, or acquiesced in the court's position. *Keathley v. Keathley*, 76 Ark. App. 150, 163, 61 S.W.3d 219, 228 (2001); *see also Colquitt v. Colquitt*, 2013 Ark. App. 733, 431 S.W.3d 316.

The value of the property distributed by the circuit court was over $2 million. There was testimony that the vehicle had a current value in the "high thirties" or low "forties." The property-division statute does not compel mathematical precision in the distribution of property; it simply requires that marital property be distributed equitably. *Jones, supra*. We cannot determine from the record that the court clearly erred in its calculations for equal property distribution. Accordingly, we affirm on this point.

IV. *Debt*

19

Rick next argues that the circuit court erred in allocating all the home-loan debt to him and not giving him any credit for the debt that was owed to his single-member LLC. He more specifically argues that California Customs loaned him money for the purchase of both residences. He complains that although the circuit court awarded one residence to each party, it assigned the debt for both residences to him without making specific findings regarding this unequal division. We disagree and affirm on this point.

The statute pertaining to the equal distribution of marital property, Arkansas Code Annotated section 9-12-315, does not apply to the division of marital debt, and there is no presumption that an equal division of debts must occur. *Middleton v. Middleton*, 2020 Ark. App. 389, 609 S.W.3d 652; *Friedly v. Friedly*, 2020 Ark. App. 167, 597 S.W.3d 135; *Pham v. Nguyen*, 2019 Ark. App. 500, 588 S.W.3d 427. An allocation of the parties' debt is an essential item to be resolved in a divorce dispute, and it must be considered in the context of the distribution of all the parties' property. *Kinder v. Kinder*, 2022 Ark. App. 476, 655 S.W.3d 880. A circuit court's decision to allocate debt to a particular party or in a particular manner is a question of fact and will not be reversed on appeal unless clearly erroneous. *Id.* It is not erroneous to determine that debts should be allocated between the parties because of their relative ability to pay. *Id.*

Here, the circuit court heard testimony that Rick was the primary financial provider during the marriage. Although Rick provided some internal company records, he admitted that the loans were not memorialized in any document. He also agreed that any loans from his company were essentially money that he owed himself since California Customs is a

20

single-member LLC. On this record, we cannot say that the circuit court's allocation of marital debt was clearly erroneous.

V. *Unequal Distribution*

Finally, Rick argues that the circuit court did not state its basis and reasons for making an unequal distribution of marital property. His argument under this point is short and appears to be premised on his other arguments for reversal and his contention that the circuit court made an unequal division of marital property. However, that is not the case. During its oral findings, the circuit court specifically stated that it had "considered the factors for an inequitable division of property. And based on those factors, the Court finds that the distribution of the parties' assets and debts in this case would be an equitable distribution when looking in the totality." Although a circuit court is required to state its basis and reasons for making an unequal division, Rick failed to provide any convincing argument on appeal that the circuit court made an unequal division of marital property. *See Chambers*, *supra*. Therefore, those factors are not necessary in this matter, and we affirm.

Affirmed.

ABRAMSON and THYER, JJ., agree.

*Brett D. Watson, Attorney at Law, PLLC*, by: *Brett D. Watson*, for appellant.

*Medlock & Gramlich, Attorneys at Law*, by: M. *Jered Medlock*, for appellee.